UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-CR-60111-DSL

UNITED STATES OF AMERICA,

vs.

PETER EDWARD MARIN,

Defendant.
_____/

## FACTUAL PROFFER

The United States of America and Peter Edward Marin ("MARIN"), agree that had this case proceeded to trial, the United States would have proven beyond a reasonable doubt the following facts, among others, establishing a violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A), which occurred in the Southern District of Florida:

During February 2025, a BSO confidential source (herein identified as the CS) contacted a BSO Detective and advised that a methamphetamine Drug Trafficking Organization (DTO) was looking for a buyer in South Florida to sell fifty (50) kilograms of methamphetamine. The CS, under law enforcement direction, was instructed to arrange a phone call between the drug traffickers and the Detective (acting in an undercover capacity "UC") to further the investigation.

On Saturday, February 23rd, 2025, the Detective received a FaceTime group call from the CS and members of the DTO. The members of the DTO were later identified as K.J.[1] and Peter Edward MARIN (hereinafter "MARIN"). During the FaceTime phone call, the Detective was able to determine K.J. was using phone number +1 (470) 471-7196, while MARIN was using phone number +1 (256) 348-9626. During the FaceTime phone call, the CS introduced the Detective as a potential drug trafficker from south Florida. While the FaceTime call was

---

[1] K.J. was participating on the group call from a prison in North Carolina using a contraband cell phone.

occurring, the Detective was only able to see MARIN's face. The members of the DTO discussed selling fifty (50) kilograms of crystal methamphetamine to the Detective, but did not provide a total price at that time.

MARIN advised that he was currently holding ten (10) kilograms of methamphetamine, which he offered to sell to the Detective for $3,500 each if the Detective was willing to travel to Atlanta, Georgia to pick them up. The Detective informed MARIN, due to logistical issues, the Detective was unable to travel to Atlanta now. The Detective told MARIN they would discuss conducting the methamphetamine drug deal at a later time.

On Monday, February 24th, 2025, the Detective made a recorded phone call to MARIN via phone number +1 (256) 348-9626. During the conversation, they discussed the logistics of the drug transaction. The Detective asked MARIN if MARIN could send one (1) kilogram of crystal methamphetamine. MARIN said he would be able to send one (1) kilogram of methamphetamine via the mail in exchange for $5,000.00. MARIN told the Detective that he could send the money digitally to MARIN's Zelle or CashApp.

In the following days, the Detective provided the CS with a BSO confidential address that the CS could forward to the DTO. On Tuesday, March 18th, 2025, the CS was provided a FedEx receipt for an overnight delivery to the name and address that the Detective had provided. The receipt was sent to the CS by K.J.

On Thursday, March 20th, 2025, the Detective retrieved the parcel from a BSO undercover mail location and transported it to a BSO secure evidence locker. On Friday, March 21st, 2025, DEA TFO Det. Rengifo and the Detective opened the box and retrieved approximately 2.05 kilograms of suspected crystal methamphetamine, which were contained within a sealed metal cannister. DEA TFO Det. Rengifo removed a small sample of methamphetamine for testing

purposes. The sample was placed inside of a DEA-issued methamphetamine test kit, which yielded positive results for the presence of methamphetamine.

After receiving the parcel, which contained the methamphetamine, the Detective placed a FaceTime call to MARIN. The Detective told MARIN he was happy with the quality of the methamphetamine. MARIN immediately asked the Detective if the Detective realized MARIN had sent two (2) kilograms of methamphetamine instead of one (1) kilogram of methamphetamine.

MARIN told the Detective that MARIN didn't feel like opening the cannister to remove one (1) kilogram of methamphetamine. MARIN stated he sent the cannister to the Detective exactly in the manner he had received it, meaning each cannister already contained two (2) kilograms of methamphetamine. The Detective told MARIN that the Detective would send MARIN the $5,000 for only one (1) kilogram and would pay the remaining balance when they completed the bigger transaction for either 20 kilograms or 50 kilograms of crystal methamphetamine.

The Detective asked MARIN to provide an account to send the $5,000. MARIN told the Detective to send the money to MARIN's cell phone via Zelle, and to his Cashapp using the name "$crypls". During the same conversation, the Detective told MARIN that the Detective had access to large quantities of cocaine, if MARIN would be interested in exchanging products.

A few hours later, the Detective received a phone call from MARIN. During the conversation, MARIN told the Detective to hold on to the payment for the second kilogram of methamphetamine due to MARIN being interested in exchanging his methamphetamine for the Detective's cocaine. MARIN also stated he would pay the difference.

Later that day at approximately 1520 hrs., Sergeant J. Augustus utilized an undercover

BSO Zelle account to make an initial payment for the narcotics transaction. $2,000 of DEA Official Investigative Funds were transferred to MARIN's Zelle account using the phone number MARIN provided (256 348 9626).

On Monday, March 24th, 2025, at approximately 0935 hrs., Sergeant Augustus utilized an undercover BSO Zelle account to make a secondary payment for the narcotics transaction. $2,000 of DEA Official Investigative Funds were transferred to MARIN's Zelle account using the phone number MARIN provided (256 348 9626).

On Wednesday, March 26th, 2025, at approximately 1111 hrs., Sergeant Augustus utilized an undercover BSO Cashapp account to settle the remaining balance for the narcotics transaction by sending $1,000.00 of DEA Official Investigative Funds to MARIN's Cashapp account using CashApp name "$crypls".

On April 25, 2025, at approximately 1215 hours, the Detective received a text message from MARIN advising that MARIN was planning on travelling to South Florida on either Sunday (04/27/25) or Monday (04/28/25) to sell the Detective ten (10) kilograms of methamphetamine. The Detective agreed to the drug deal and advised he would await his arrival.

On April 28, 2025, the Detective received a text message from MARIN advising he was running a little behind but would be arriving around 2000 hours. The Detective later spoke with MARIN, who stated he was driving down and was planning on staying close to the Fort Lauderdale airport. The Detective told MARIN he would provide MARIN with a hotel close to the airport, where they could meet to facilitate/complete the drug deal. While they continued to talk, MARIN told the Detective that the methamphetamine was stored in the same style cannisters as the previous cannisters he sent via the mail.

Once it was determined MARIN was travelling via vehicle and would be flying back to

Atlanta, Georgia the following day, DEA TFO Det. Rengifo was able to locate the car rental company MARIN used to rent a red Dodge Ram 1500 bearing FL tag#QZUN83. DEA TFO Det. Rengifo was then able to track the listed vehicle as the vehicle travelled south on the Florida Turnpike toward Broward County. Members of law enforcement, including the DEA and BSO, briefed at a pre-determined location and discussed the operation that would occur. The Detective provided MARIN with an address advantageous for law enforcement to meet MARIN to complete the methamphetamine drug deal.

MARIN agreed to meet at this location and advised he would be arriving within an hour. DEA and BSO were able to establish surveillance around the provided address awaiting MARIN's arrival. The Detective also arrived at the predetermined deal location driving a BSO confidential vehicle. The Detective was also provided with covert audio/video equipment, which allowed law enforcement to monitor the transaction as it transpired.

At approximately 1940 hours, MARIN arrived at the provided address driving the red Dodge Ram as a sole occupant. MARIN parked along the passenger side of the Detective's confidential vehicle. The Detective and MARIN then met with each other in the parking lot where MARIN handed over a FedEx box to the Detective, which MARIN had stored in the back seat of the Dodge Ram he was driving.

The Detective took possession of the FedEx box and placed it in the hatch of the confidential vehicle. The Detective then opened the FedEx box and removed one (1) of the metal cannisters. Both the Detective and MARIN entered the confidential vehicle to allow the Detective to inspect the quality of the methamphetamine. Once the Detective opened the cannister and inspected the methamphetamine, the Detective provided the take down signal and MARIN was apprehended without incident.

Once MARIN was in custody, MARIN requested an attorney. Inside of the FedEx box, law enforcement officers located a total of five (5) cannisters, to include the one (1) cannister the Detective had opened. The cannisters were opened and a total approximate weight of 10.04 kilograms of suspected methamphetamine were found. DEA TFO Rengifo removed a small sample of the suspected methamphetamine from one of the cannisters and used a BSO issued methamphetamine field test kit, which yielded positive results for the presence of methamphetamine.

The narcotics evidence was sent to the DEA lab for testing. The methamphetamine came back as 98% pure, with an amount of pure substance weight of 1,954 grams for the one exhibit tested. This exhibit consisted of the first cannister that was mailed by MARIN to the UC. The other five (5) cannisters of methamphetamine recovered directly from MARIN on the date of arrest, likewise, tested positive for methamphetamine at the DEA lab.

The parties agree that these facts are sufficient to prove the elements of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

HAYDEN O'BYRNE
UNITED STATES ATTORNEY

Date: 7/23/2025     By: _____
JAMES M. USTYNOSKI
ASSISTANT UNITED STATES ATTORNEY

Date: 7/23/2025     By: _____
DAVID TRONTZ
COUNSEL FOR DEFENDANT

Date: 7/23/2025     By: _____
PETER EDWARD MARIN
DEFENDANT